UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CEDAR SWAMP HOLDINGS, INC., et al.,

                Plaintiffs,

        -against-                          06 Civ. 13626 (LAK)

FAITH ZAMAN, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

                Michael P. Zweig
                Brian R. Socolow
                John A. Piskora
                LOEB & LOEB LLP
                *Attorneys for Plaintiffs*

                Mark A. Cymrot
                Peder A. Garske
                Ambika Biggs
                BAKER & HOSTETLER LLP
                *Attorneys for Defendants Zaman, Derbyshire, Hoareau,*
                *Eurofinch Ltd., Fitzjohn's Holdings Inc., Oceanview Estate*
                *LLC, and Arzie Zamarni*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiffs are (1) Duli Yang Teramat Mulia Paduka Seri Pengiran Digadong Sahibul

Mal Pengiran Muda Haji Jefri Bolkiah, the youngest brother of the ruling Sultan of Brunei ("Prince

Jefri"), (2) Cedar Swamp Holdings, Inc. ("Cedar Swamp") and Casa de Meadows, Inc. (Cayman

Islands) ("Cayman Casa"), and (3) Amedeo Hotels Limited Partnership ("Amedeo"), all of which

are beneficially owned by Prince Jefri. They sue, among others, Faith Zaman and Thomas William Derbyshire, husband and wife as well as English barristers, in connection with the management of Prince Jefri's assets. Zaman and Derbyshire are charged with various counts of, *inter alia*, fraud and breach of fiduciary duty, as well as one count of racketeering in violation of the Racketeering Influenced Corrupt Organizations Act ("RICO").[1] They move to dismiss the RICO claim. Plaintiffs move for leave to amend the complaint.

*Facts*

I.    *The Amended Complaint*

According to the amended complaint,[2] Zaman and Derbyshire from approximately May 2004 to November 2006 served as "principal legal advisors, strategists and confidantes" to Prince Jefri, members of his family, and companies owned or controlled by them.[3] Prince Jefri agreed to pay Zaman and Derbyshire each £1 million per year in return for their services.[4] He gave Zaman a limited power of attorney and appointed her the director and officer of Cedar Swamp and Cayman Casa, as well as other unspecified entities that he owned.[5] Derbyshire provided legal advice

---

[1]    18 U.S.C. § 1962(c).

[2]    Docket Item 46 ("Cpt.").

[3]    Cpt. ¶¶ 1, 27.

[4]    *Id.* ¶ 28.

[5]    *Id.* ¶¶ 30, 32, 33.

3

to Prince Jefri and took control of Prince Jefri's companies along with Zaman.[6] In February 2006, Zaman became the managing director of the New York Palace Hotel, which is owned by Amedeo.[7]

Plaintiffs allege that Zaman and Derbyshire breached their fiduciary and other obligations, principally by

(1) causing Cedar Swamp to sell a piece of property called the Sunninghill Estate[8] to defendant Westfields Invest Limited, LLC ("Westfields") – a company allegedly owned or controlled by Zaman and Derbyshire and operated by their friend, defendant Charles Hoareau – in a "sham transaction" where "[n]either the down payment nor any other sales proceeds were ever delivered to Cedar Swamp or Prince Jefri,"[9]

(2) depositing a check payable to Cayman Casa into the account of a "twin, doppelganger entity" owned by Zaman called Casa de Meadows Inc., Cayman Islands Corp., LLC ("Delaware Casa"), and using the money to buy property for one of their companies, defendant Oceanview Estate, LLC ("Oceanview"),[10]

---

[6]   *Id.* ¶ 36.

[7]   *Id.* ¶¶ 9, 34.

[8]   The original complaint referred to this property as the "Sunningdale Estate." *See* Docket Item 1 (original complaint) at ¶ 32.

[9]   Cpt. ¶¶ 41-56.

[10]   *Id.* ¶¶ 57-70.

4

(3) falsifying employment documents to overstate Zaman's compensation for directing Amedeo and managing the Palace Hotel,[11]

(4) hiring Zaman's brother, defendant Arzie Zamarni, at a high salary and for an unnecessary position at the Palace Hotel, despite an anti-nepotism policy,[12]

(5) using Amedeo corporate credit cards for personal expenses,[13]

(6) causing the Palace Hotel to purchase over $4 million worth of television and related equipment – which it never received – from Golden Twist, Ltd., a company owned by Prince Jefri, and depositing $1 million of the sale proceeds into Zaman's personal account,[14]

(7) executing long-term, below-market subleases of real property belonging to Amedeo to defendants Fitzjohn's Holdings Inc. ("Fitzjohn's") and Eurofinch Limited ("Eurofinch"), which they owned or controlled,[15]

---

[11] *Id.* ¶¶ 71-79.

[12] *Id.* ¶¶ 80-81.

[13] *Id.* ¶¶ 82-85.

[14] *Id.* ¶¶ 86-102.

[15] *Id.* ¶¶ 103-108.

5

(8) drafting an agreement whereby they would receive a $40 million brokerage commission for causing Amedeo to sell the Palace Hotel and another hotel owned by Prince Jefri,[16]

(9) devoting their time to running a hotel they owned in Texas instead of Prince Jefri's affairs,[17] and

(10) failing to return confidential documents relating to Prince Jefri's companies following their November 2006 termination and threatening to disclose privileged information if plaintiffs did not drop this lawsuit.[18]

Count Twenty-Four of the amended complaint charges Zaman and Derbyshire with a RICO violation. According to plaintiffs, Zaman, Derbyshire, Westfields, Hoareau, Delaware Casa, Oceanview, Zamarni, Fitzjohn's, and Eurofinch comprised a RICO enterprise. Moreover, plaintiffs claim, Zaman and Derbyshire's use of telephone calls, faxes, e-mails, and wire transfers to effectuate various of the above schemes allegedly constituted predicate acts of mail and wire fraud, and their wrongful depositing of a check made out to Cayman Casa into Delaware Casa's account allegedly constituted the predicate act of bank fraud. The RICO claim is the only basis for federal jurisdiction.

---

[16] *Id.* ¶ 109.

[17] *Id.* ¶ 110.

[18] *Id.* ¶¶ 111-115.

*II.    Proceedings*

On March 2, 2007 defendants moved to dismiss the RICO claim.[19] They filed also an answer to the amended complaint as well as counterclaims for abuse of process, indemnification, breach of contract, and unjust enrichment for, *inter alia*, the failure of various plaintiffs to pay Zaman and Derbyshire their agreed compensation.[20] On April 5, 2007, plaintiffs answered the counterclaims[21] and cross-moved for leave to amend the complaint in the event the RICO claim were dismissed.[22]

Defendants subsequently sought,[23] and the Court granted,[24] leave to file a third party complaint, alleging claims for breach of contract, unjust enrichment, and indemnification against two of Prince Jefri's sons, Pengiran Muda Abdul Hakeem and Pengiran Muda Bahar, and his ex-wife, Jefridah Mohammed Louis.[25]

After briefing was complete on the motion to dismiss and the conditional cross-

---

[19]  Docket Item 48.

[20]  Docket Items 50, 51, 52.

[21]  Docket Items 74, 75.

[22]  Docket Item 71.

[23]  Docket Item 76.

[24]  Docket Item 88. *See* Docket Item 92 (Order, May 11, 2007, declining to vacate and modify grant of motion to file third party complaint).

[25]  *See* Docket Item 93.

Neither defendants' counterclaims nor the third party complaint allege grounds for federal jurisdiction. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

motion to amend, plaintiffs on May 9, 2007 filed an additional motion to amend the complaint.[26] They claim to have discovered an e-mail contradicting prior sworn statements by Zaman and Derbyshire that they did not own or control Westfields and therefore did not defraud Prince Jefri in connection with the Sunninghill transfer. Plaintiffs assert that this newly discovered evidence bolsters their claim that defendants were engaged in a continuing pattern of racketeering activity.

*Discussion*

I.    *Motion to Dismiss*

    A.    *Standard*

        In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[27] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[28]

---

[26]

Docket Item 89.

[27]

*Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002)).

[28]

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Allegations of fraud, and of breach of fiduciary duty consisting of fraud by a fiduciary, are subject to a more exacting standard under Federal Rule of Civil Procedure 9(b). *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, __ F. Supp. 2d __, No. 03 Civ. 2387 (LAK), 2007 WL 926916, *7 (S.D.N.Y. Mar. 27, 2007) (laying out FED. R. CIV. P. 9(b) standard). As will become clear, the Court need not reach the question whether plaintiffs have alleged fraud with sufficient particularity, as it is persuaded that they have failed adequately to allege the existence of an enterprise for purposes of their RICO claim.

B.    *Procedural Issues*

Plaintiffs argue that the motion to dismiss should be denied because defendants brought it as a motion for failure to state a claim under Rule 12(b)(6),[29] instead of as a motion for judgment on the pleadings under Rule 12(c), as the motion was made after defendants answered the amended complaint. This argument is both dilatory and without merit.

Defendants' motion, contrary to plaintiffs' assertions, was filed before the answer to the amended complaint.[30] In any event, how defendants labeled their motion is immaterial. The cases plaintiffs cite make clear that motions to dismiss filed after the pleadings are complete are treated essentially the same as Rule 12(b)(6) motions regardless of how they were or should have been labeled.[31] Hence, even if plaintiffs were correct that the motion should have been labeled a Rule 12(c) motion, this would not be a ground for denial.

C.    *The RICO Claim*

The RICO statute, in relevant part, makes it unlawful "for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

---

[29]

Actually, they erroneously labeled it a "Rule 26(b)(6)" motion. *See* Docket Item 48.

[30]

*Compare* Docket Item 48 (motion to dismiss, filed Mar. 2, 2007 at 8:28 p.m.) *with* Docket Item 50 (answer to amended complaint, filed Mar. 2, 2007 at 8:46 p.m.).

[31]

*See Nat'l Ass'n of Pharm. Mfgs., Inc. v. Ayerst Labs., Div. of/and Am. Home Prods. Corp.*, 850 F.2d 904, 909 n.2 (2d Cir. 1988) ("Pursuant to FED. R. CIV. P. 12(h)(2) . . . a defense of failure to state a claim may be raised in a Rule 12(c) motion for judgment on the pleadings, and when this occurs the court simply treats the motion as if it were a motion to dismiss."); *accord Leather v. Eyck*, 180 F.3d 420, 423 n.4 (2d Cir. 1999) (same).

racketeering activity."[32] "To establish a civil RICO claim for violation of Section 1962(c), a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."[33]

Allegations of RICO violations not only have a stigmatizing effect on those named as defendants,[34] but carry also the possibility of treble damages.[35] RICO therefore is an "unusually potent weapon," sometimes referred to as the "litigation equivalent of a thermonuclear device."[36] Accordingly, courts – ever prone to using colorful metaphors when analyzing RICO – have warned that putative civil RICO claims that "are nothing more than sheep masquerading in wolves' clothing,"[37] or ordinary fraud cases "clothed in the Emperor's trendy garb"[38] should be "flush[ed] out" at early stages of the litigation.[39]

---

[32]

    18 U.S.C. § 1962(c).

[33]

    *E.g.*, *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994) (quotations omitted).

[34]

    *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).

[35]

    *See* 18 U.S.C. § 1964(c).

[36]

    *Katzman*, 167 F.R.D. at 655 (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)); *accord, e.g.*, *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003).

[37]

    *Kirk v. Heppt*, 423 F. Supp. 2d 147, 150 (S.D.N.Y. 2006) (quoting *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606 (RWS), 2004 WL 2187069, *5 (S.D.N.Y. Sept. 29, 2004)).

[38]

    *In re Integrated Res. Real Estate Ltd. P'ships Secs. Litig.*, 850 F. Supp. 1105, 1148 (S.D.N.Y. 1993).

[39]

    *Katzman*, 167 F.R.D. at 655 (quoting *Figueroa*, 896 F.2d at 650).

1.      *"Enterprise" Generally*

An "enterprise," for RICO purposes, is defined to include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[40] The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."[41]

Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities"[42] of the association to determine whether "its members functioned as a unit."[43] Accordingly, merely stringing together a list of defendants and labeling them an enterprise is insufficient to state a RICO claim.[44]

Moreover, courts have held that allegations of a "hub-and-spokes" structure – that is, allegations that a common defendant perpetrated various independent frauds, each with the aid of a different co-defendant – do not satisfy the enterprise element of a RICO claim. For example, in

---

[40]

18 U.S.C. § 1961(4).

[41]

*United States v. Turkette*, 452 U.S. 576, 583 (1981); *accord First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).

[42]

*First Capital*, 385 F.3d at 174-75 (quoting *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991)).

[43]

*Id.* (quoting *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001)).

[44]

*E.g.*, *Nasik*, 165 F. Supp. 2d at 539; *accord Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352, *7 (S.D.N.Y. Sept. 30, 2003).

*New York Automobile Insurance Plan v. All Purpose Agency and Brokerage, Inc.*,[45] the plaintiffs alleged a scheme orchestrated by a single insurance broker fraudulently to obtain reduced automobile insurance rates for various insureds. The court rejected the claim that the insurance broker and the insureds together formed an association-in-fact enterprise for RICO purposes where the "[i]nsureds each committed similar but independent frauds with the aid of the [insurance broker], and that each [i]nsured acted on a particular occasion to benefit himself or herself and not to benefit any other insured."[46] A series of discontinuous independent frauds does not constitute an enterprise, the court held, but rather a series of two-party conspiracies.[47]

Similarly, in *First Nationwide Bank v. Gelt Funding, Corp.*,[48] the plaintiffs alleged a scheme fraudulently to obtain loans involving a single mortgage broker and several different borrowers, each seeking unrelated loans. The court rejected the plaintiffs' RICO claim, holding that their claims of a "classic 'hub and spoke' conspiracy, in which the [mortgage broker was] the 'hub' and the various borrower defendants were the 'spokes'"[49] were insufficient to allege a RICO enterprise where they failed to specify "how all defendants, including various borrowers, joined together as a group to perpetrate" the alleged frauds.[50]

---

[45]

No. 97 Civ. 3164 (KTD), 1998 WL 695869 (S.D.N.Y. Oct. 6, 1998).

[46]

*Id.* at *6 (denying plaintiffs' motion for summary judgment).

[47]

*Id.*

[48]

820 F. Supp. 89 (S.D.N.Y. 1993).

[49]

*Id.* at 97.

[50]

*Id.* at 98.

In *Aiu Insurance Co. v. Olmecs Medical Supply, Inc.*,[51] by contrast, the court upheld the sufficiency of a RICO claim alleging a scheme by doctors and sellers of medical equipment to submit to insurance companies fraudulent charges for unneeded medical supplies on behalf of individuals injured in automobile accidents. The court rejected the argument that the plaintiffs simply had alleged a hub-and-spokes conspiracy where they described "in detail each defendant's necessary and symbiotic contribution to the overall scheme."[52]

In sum, an allegation that the perpetrator of a series of independent fraudulent transactions used a different accomplice to aid each transaction is insufficient to justify a conclusion that the perpetrator and the accomplices together constituted an ongoing organization or functioned as a continuing unit. To satisfy the enterprise element of a RICO claim, a plaintiff must allege that the defendants operated symbiotically and played necessary roles in the achievement of a common purpose.

2.    *This Case*

Plaintiffs have failed to allege the existence of an enterprise for RICO purposes. Assuming *arguendo* that plaintiffs have alleged a pattern of racketeering activity – and that those allegations are sufficient under Rule 9(b) – the amended complaint simply groups together all of the individuals and entities involved in the racketeering acts and calls them an enterprise. It contains no allegation that this group operated according to any structure or hierarchy. With the exception of Zaman and Derbyshire, no participant is alleged to have acted for the benefit of any other participant.

---

[51]    CV-04-2934, 2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005).

[52]    *Id.* at *7; *see id.* at *1 (describing "the distinct roles of each category of defendant").

They appear to have had no relationship to one another, and their actions and involvement in Zaman's and Derbyshire's schemes appear to have been isolated and independent. In sum, there is no indication that this group was an "ongoing organization" as opposed to an *ad hoc* collection of entities and individuals who each happened to have been involved in one scheme or another against Prince Jefri.

Notably, plaintiffs themselves assert that defendants operated according to a hub-and-spokes structure of which Zaman and Derbyshire were the "hub" and the other members of the alleged "enterprise" were the "spokes."[53] But this is precisely the kind of structure that the *New York Automobile* and *First Nationwide Bank* courts held is insufficient to satisfy the enterprise element of a RICO claim.

Plaintiffs argue that defendants were not engaged in a series of independent frauds. Each alleged fraud, they claim, was a smaller "implementing scheme" that formed part of a single "master scheme" to enrich Zaman and Derbyshire at Prince Jefri's expense.[54] This is unpersuasive. Taking the allegations in the amended complaint as true, there is no indication that Zaman's and Derbyshire's "implementing schemes" were related to one another. For example, the "sham" Sunninghill transaction and the Cayman Casa bank fraud did not rely upon one another for completion or implementation. Nor did these two schemes contribute necessarily and symbiotically to the achievement of Zaman's and Derbyshire's overall purpose. Each scheme alone was sufficient but not necessary to serve the goal of the purported "master scheme" – enriching Zaman and Derbyshire at Prince Jefri's expense.

---

[53]    Pl. Mem. Opp'n Mot. Dismiss 31.

[54]    *See id.* 13.

Furthermore, nothing in the amended complaint supports the inference the that participants in the Sunninghill scheme (Westfields and Hoareau) had anything to do with, let alone acted for the benefit of, the participants in the Cayman Casa bank fraud (Delaware Casa and Oceanview), or *vice versa*. Rather, it appears that the participants in each scheme acted on a particular occasion to benefit themselves and not to benefit the participants of any other scheme. In the last analysis, the alleged "implementing schemes" were similar but unrelated frauds. They were not necessary components of a broader undertaking. The facts of this case therefore are much closer to *New York Automobile* and *First Nationwide Bank* than to *Aiu Insurance Co.*

Perhaps the most that can be said is that Zaman and Derbyshire themselves constituted an enterprise – a husband and wife "team," so to speak. But even this dubious premise would not save plaintiffs' RICO claim. Zaman and Derbyshire are alleged to be the "persons" who were "associated with an[] enterprise" under the RICO statute. Courts long have held that a "person" for RICO purposes must be distinct from the alleged enterprise.[55]

The Court recognizes that the RICO statute was intended to cast a wide net[56] and that even loosely affiliated individuals with little organizational structure can constitute an enterprise where the group exists solely for the purpose of carrying out a pattern of racketeering activity.[57] But

---

[55] *E.g.*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001) (agreeing with numerous Court of Appeals cases adopting distinctness principle); *accord Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir. 1985) (citing cases), *cert. denied*, 474 U.S. 1058 (1986).

[56] *See, e.g.*, *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) ("[T]he language and the history suggest that Congress sought to define [enterprise] as broadly as possible").

[57] *See RD Mgmt. Corp. v. Samuels*, No. 02 Civ. 4876 (SWK), 2003 WL 21254076, *7 (S.D.N.Y. May 29, 2003) ("[T]he Second Circuit has repeatedly found a sufficient enterprise where the complaint alleges a group without a centralized hierarchy existing for the sole purpose of carrying out a pattern of racketeering acts (citing cases)).

15

it is not persuaded that the group constituting the alleged "enterprise" in this case is anything other than a laundry list of the individuals and entities that were connected to Zaman and Derbyshire and somehow involved in one of their alleged schemes. An enterprise, however, must be more than the sum of the participants in a series of independent frauds. Accordingly, as the complaint states little more than garden variety fraud and breach of fiduciary duty claims – assuming that Rule 9(b) is satisfied here – plaintiffs have failed to state a RICO claim.

## II.     *Leave to Amend*

Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint shall be given freely when justice so requires. Nonetheless, the Court may deny leave if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) would prejudice the opposing party, or (4) would be futile.[58]

As noted, plaintiffs have filed two motions to amend the complaint. The first requests leave to amend "should any aspect of Defendants' motion [to dismiss the RICO claim] be granted."[59] It fails to indicate, however, what new allegations plaintiffs would make or how they would cure the defective RICO claim.

The second motion seeks leave to amend in light of a newly discovered e-mail that, plaintiffs claim, evidences Zaman's and Derbyshire's ownership of Westfields, despite their previous sworn statements that they did not own or control the company. Plaintiffs contend that the new

---

[58]

  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *accord Lee v. Regal Cruises, Ltd.*, 916 F. Supp. 300, 303 (S.D.N.Y. 1996).

[59]

  Pl. Mem. Opp'n Mot. Dismiss 34.

allegations would show "the continuity of Defendants' pattern of racketeering."[60] But the Court fails to see how these allegations would strengthen the claim that the disparate players involved in Zaman's and Derbyshire's purported schemes formed an ongoing organization or functioned as a unit. Indeed, the amended complaint asserts that Zaman and Derbyshire owned Westfields at the time of the Sunninghill transfer,[61] an allegation that the Court presumed to be true in deciding the motion to dismiss. Even if plaintiffs were permitted to add allegations concerning the newly discovered e-mail, the RICO claim still would be fatally flawed for failure to allege an enterprise.

Plaintiffs already have had two opportunities to plead a proper RICO claim. As they have pointed to no new allegations that would permit them to do so on a third attempt, the Court concludes that leave to amend would be futile.

*Conclusion*

Defendants' motion to dismiss the RICO claim [docket item 48] is granted.[62] Plaintiffs' motions for leave to file an amended complaint [docket items 71, 89] are denied.

As no other basis for federal jurisdiction exists, the state law claims, counterclaims, and third party complaint must be dismissed as well, albeit for lack of subject matter jurisdiction.[63]

---

[60]

Pl. Mem. Supp. Mot. Amend 1.

[61]

*See* Cpt. ¶¶ 44-45.

[62]

As this ruling is based entirely on the Court's view that plaintiffs fail to allege an enterprise within the meaning of the RICO statute, it is without prejudice to any action that either party may file in the state courts.

[63]

*E.g.*, *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988) (district court ordinarily should dismiss state law claims under 28 U.S.C. § 1367(c)(3) when federal claims have been dismissed); *Pagliuco v. City of Bridgeport*, No. 3:01 CV 836 (WIG),

The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:          May 17, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

2005 WL 3416131, *9 (D. Conn. Dec. 13, 2005) (declining to exercise supplemental jurisdiction over state law counterclaim where original complaint was dismissed); *Brooklyn Hosp. Ctr. v. Diversified Info. Techs., Inc.*, 133 F. Supp. 2d 197, 203 (E.D.N.Y. 2001) (declining to exercise supplemental jurisdiction over third party complaint where original complaint was remanded to state court).

Defendants do not move to dismiss the remaining state law claims and urge the Court to exercise supplemental jurisdiction. Def. Rep. Mem. Supp. Mot. Dismiss 22 n.15. They do this presumably so the Court will exercise supplemental jurisdiction also over the counterclaims and third party complaint. The Court nevertheless adheres to the general rule that once the federal claims in a complaint have been dismissed, the state law claims should be dismissed as well, *Carnegie-Mellon Univ.*, 484 U.S. at 350 & n.7, especially at early stages in the proceedings when little is to be gained by way of judicial economy from retaining jurisdiction, *cf. Auscape Int'l v. Nat'l Geographic Soc.*, 461 F. Supp. 2d 174, 178 n.8 (S.D.N.Y. 2006) (court retained supplemental jurisdiction over state law claims for the sake of judicial economy because (1) the state law claims were intimately related to the federal claims, which had been litigated extensively, (2) the state law claims already had been briefed and argued, and (3) the court and parties already had invested heavily in resolving them). The Court notes also that a party's consent or request does not confer subject matter jurisdiction upon a court. *E.g.*, *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.* 466 F.3d 232, 238 (2d Cir. 2006).